CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA .
FILED

**AUG 1 7 2012**

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| DONELL J. BLOUNT, SR., | ) | CASE NO. 7:11CV00362 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| vs. | ) | |
| | ) | |
| WILLIE NEECE, ET AL., | ) | By: Glen E. Conrad |
| | ) | Chief United States District Judge |
| Defendants. | ) | |

Donell J. Blount, Sr., a Virginia inmate proceeding pro se, filed this civil rights action

pursuant to 42 U.S.C. § 1983, alleging that after his ambulatory restraint handcuff clamped down

on his wrist while he was resting, the defendant prison officials ignored his complaints of pain, in

violation of his Eighth Amendment rights.  After engaging in discovery, Blount responded to

defendants' motion for summary judgment.  Upon review of the record, the court finds that

defendants' motion must be granted.

**I**

**A. Background**

The circumstances in which Blount's injury arose and his related medical records are

largely uncontested.[1]  Blount is an inmate at Red Onion State Prison.  Near midnight on May 19,

2011, Blount covered his cell door window with clothing and refused floor officers' orders to

remove the covering.  When Lt. Fannin arrived and ordered Blount to uncover his window,

Blount complied.  Officers removed Blount from his cell and searched it.  When Fannin twice

ordered Blount to reenter his cell, Blount refused both times.  Lt. Blevins authorized placing

---

[1]  On summary judgment, defendants offer affidavits from Red Onion State Prison officers, Sgt.
Vitatoe and Neece, Sgt. Lambert, and Lt. Fannin, and an affidavit from Red Onion's Director of Nursing
Vicki Phipps, attaching and summarizing the information in Blount's medical records for May to
December 2011.  In response to defendants' motion, Blount submits his own affidavit and attachments.

Blount in ambulatory restraints, an inmate control mechanism which consists of ankle shackles, handcuffs with a black box over them, and a chain attached to the cuffs and the shackles. At approximately 12:35 a.m. on May 20, 2011, Vitatoe assisted Lt. Fannin in escorting Blount to the vestibule and assisted in applying the ambulatory restraints. Neece videotaped the officers placing the ambulatory restraints on Blount. A nurse checked the restraints for tightness by placing two fingers under each restraint.

In their assignment as floor officers on May 20, 2011, Vitatoe and Neece made regular security checks in the housing unit, walking past and looking into each cell to check each inmate's status. If an inmate pushes his intercom button, it will notify the control room officer, who will respond to learn the inmate's complaint and have a floor officer report to that inmate's the cell. As floor officers, Vitatoe and Neece did not have authority under prison policy to enter an inmate's cell without a supervisor present.

At approximately 6:30 a.m., Sgt. Lambert arrived at Blount's cell to check on him, and Blount reported that his left hand restraint was too tight. Lambert entered the cell and found that the left handcuff was tight. Lambert loosened the cuffs, adjusted them, locked them again, and had a nurse check Blount's wrist and the restraints. The nurse noted that Blount had a slight, reddened indentation around his left wrist, with no open areas. After the officers loosened the restraint, the nurse noted that she was able to place two fingers under each restraint and that Blount was complaining that his wrist was hurting. The nurse noted that he was given his morning medications which included Tylenol prescribed for him a few days earlier.[2] The nurse also instructed him to apply cold compresses. When Blount was released, at 11:00 a.m., he

---

[2] On May 16, 2011, officers had placed Blount in ambulatory restraints. Blount became disruptive while the nurse was assessing the restraints, so the assessment was stopped. When officers released Blount from ambulatory restraints on May 17, 2011, he complained that the left handcuff was too tight. The nurse noted slight redness and slight edema to Blount's left wrist, gave Blount Tylenol for five days in accordance with nursing protocol, and instructed him to apply cold compresses.

refused to have his vital signs taken and complained that his left hand was numb. The nurse noted full range of motion and noted that the wrist and hand had no redness. She also noted that Blount was already on Tylenol and advised him to follow up with medical as needed.

Blount's medical records indicate that on May 22, 2011, officers again placed Blount in ambulatory restraints and the nurse checked them, noting no complaints from Blount and no injuries. When officers released Blount from ambulatory restraints on May 24, 2011, the nurse noted that he complained of left wrist pain, but was able to move his wrist without difficulty. The nurse noted no injuries. After May 24, 2011, the nursing staff did not note any complaints from Blount about pain or numbness in his left wrist, although his chart notes numerous assessments for other medical complaints between May and December 2011.

### B. Blount's Claims

Blount states that at some point in the night, while he was trying to sleep in the ambulatory restraints, he rolled over and "the weight of his body caused the left handcuff (which had not been properly double locked) to close down extremely tight on [his] wrist causing instantaneous, extreme pain. He was unable to loosen the cuff." (DE 39-1, ¶3.) Blount pushed the emergency intercom button, but no one answered. When Officers Neece and Vitatoe came by Blount's cell during their regular security checks, Blount showed them the cuff. Blount asked them repeatedly over the next several hours to call a supervisor to loosen the cuff and a nurse to check his wrist. Neece and Vitatoe refused, saying it was not their problem, that Blount had made them put him in ambulatory restraints, and advising to "tell the next shift" his complaints. (DE 39-1, ¶3.) Blount states that right before the shift change, other inmates covered their cell windows. When a captain came to investigate, the inmates told the officers about Blount's

3

problem with the clamped handcuff, and the captain ordered Lambert to check Blount's restraints.

Blount states that the injury he suffered as a result of the clamped handcuff incident "was extremely painful and eventually caused numbness and sharp[ ] pains in [his] wrist, thumb and pinkie for approximately one and a half months." (DE 39-1, ¶11.) When Blount told nurses about the pain and numbness, they told him "with the type of injury I had (compression of the nerves) I should give it time to heal, [and] there was really nothing they could do." (DE 39-1, ¶16.)

Blount sues Neece and Vitatoe, for failing to notify a supervisor of the problem with Blount's cuff and for failing to provide him access to medical care. Blount sues Lambert, for not releasing him from the ambulatory restraints although Blount was no longer disruptive and was in pain. As relief, Blount seeks monetary damages and an "[i]njunction prohibiting the use of metal restraints on prisoners who have injuries to their wrist[s] and ankles that are exacerbated by the metal restraints." (DE 1, p. 3.)

### C. Defendants' Evidence

In addition to the uncontested information already summarized, defendants' affidavits offer their response to Blount's claims. Vitatoe does not recall having any interaction with Blount after placing him in ambulatory restraints on May 20, 2011. (DE 21-3, ¶5, 7.) Neither Vitatoe nor Neece recalls Blount making any complaint about his ambulatory restraints. (Id. ¶7; DE 21-1, ¶5.) Both officers state that if Blount had told them that he had a problem with the restraints, they would have contacted a supervisor to correct the situation. Vitatoe and Neece also do not recall the control room officer asking them to check on Blount because of a complaint about the restraints. (DE 21-3, ¶6.)

4

When Lambert arrived at Blount's cell at the start of his shift to remove Blount's

mattress, "supervising staff [during the shift that had just ended] still had Blount documented as

being disruptive."  (DE 21-2, ¶5.)  After removing the clamped cuff, Lambert did not notice any

break in the skin, unusual swelling, or other injury on Blount's wrists.  Lambert did not have

authority to remove Blount from restraints, as a lieutenant must make this decision.  According

to the incident report on May 20, 2011, at approximately 11:00 a.m., Lt. Fleming (who is not a

party to the lawsuit) ordered that Blount be released from ambulatory restraints.  (DE 21-2, ¶5.)

## II

### A.  Standard of Review

Summary judgment is proper where there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Rule 56(c)

mandates entry of summary judgment against a party who "after adequate time for discovery and

upon motion . . . fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex v. Catrett, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists if

reasonable jurors could find by a preponderance of the evidence that the nonmoving party is

entitled to a verdict in his favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Although the court must view genuinely disputed facts in the light most favorable to the

nonmovant, the court "need not accept the legal conclusions drawn from the facts" and "need not

accept as true unwarranted inferences, unreasonable conclusions, or arguments." Kloth v.

Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006) (omitting quotation).  "When opposing

parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007) (omitting internal quotations, alterations, and citations).  To defeat a supported motion for summary judgment, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. (omitting quotation). In particular, where the record contains an unchallenged videotape capturing the events in question, the court must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.  Id.; Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008).

## B. Eighth Amendment Standard

It is well established that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting  Whitley v. Albers, 475 U.S. 312, 319 (1986)).  Claims under the Eighth Amendment have two components: (1) the objective component, whether a prison official's alleged wrongdoing was "objectively harmful" enough to establish a constitutional violation, and (2) a subjective component, whether the official "act[ed] with a sufficiently culpable state of mind." Id. at 8 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  The showing required for each of these components varies with the context in which the plaintiff's claim arises, and the nature of the objective component requires comparison to "contemporary standards of decency" in that context.  Id.

**1. Deliberate Indifference Claims**

While prison officials must "take reasonable measures to guarantee the safety of the inmates," Hudson v. Palmer, 468 U.S. 517, 526-527 (1984), "[t]o the extent that [prison living] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Therefore, only "extreme deprivations" can satisfy the objective element of an Eighth Amendment claim challenging conditions of confinement. Hudson, 503 U.S. at 9. An inmate plaintiff must show that a prison official's act or omission resulted in the denial of "the minimal civilized measure of life's necessities." Rhodes, 452 U.S. at 347. Specifically, the "prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions" or "demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions."[3] Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (omitting internal quotations).

> The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual punishments. If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment.

Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993).

The subjective component of a conditions of confinement claim requires a showing that the prison official acted with deliberate indifference to a condition that posed a substantial risk of

---

[3] In Wilkins v. Gaddy, __U.S.__, 130 S. Ct. 1175 (2010), the United States Supreme Court rejected prior circuit precedent interpreting Hudson v. McMillian, 503 U.S. 1 (1992), as supporting a rule that an inmate cannot succeed on his § 1983 excessive force claim if his injuries were, objectively, de minimis. In the context of conditions of confinement, however, the United States Court of Appeals for the Fourth Circuit has continued to apply the standard set forth in Shakka, 71 F.3d 166, which requires a showing of "significant physical or emotional injury resulting from the challenged conditions" to satisfy the objective element of an Eighth Amendment claim. See Webb v. Deboo, 423 F. App'x 299, 300 (4th Cir. 2011) (finding that Shakka standard applied to § 1983 claim alleging that prison's overcrowding and sanitation problems violated inmate's Eighth Amendment rights).

harm to the inmate. <u>Farmer v. Brennan</u>, 511 U.S. 825, 835-37 (1994). To prove deliberate indifference, the inmate must show that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he actually drew that inference, and that he disregarded the risk by failing to take "reasonable measures" to alleviate the risk. <u>Id.</u>

The same two-part standard applies to claims that prison officials ignored an inmate's need for medical care. <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976) (internal quotations omitted). The inmate must show that the officer exhibited "deliberate indifference" to the inmate's "serious medical needs." <u>Id.</u> at 104-105. "[A] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotations omitted). Inadvertent failure to recognize a need for treatment does not present a constitutional deprivation. <u>Estelle</u>, 429 U.S. at 105-106.

## 2. Excessive Force Claims

In the excessive force context, the court must inquire whether officials, subjectively, applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm," and "[whether] the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." <u>Hudson</u>, 503 U.S. at 7-8 (omitting internal quotations). In <u>Whitley</u>, the Supreme Court recognized that relevant factors to consider in making the subjective inquiry are: (1) the need for application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury, (4) the threat reasonably perceived by the responsible officials based on the facts known to them, and (5) any efforts made to temper the severity of a forceful response. 475 U.S. at 321.

The objective component of an excessive force claim "can be met by the pain itself, even if an inmate has no enduring injury." Williams v. Benjamin, 77 F.3d 756, 762 (4th Cir. 1996) (omitting internal quotations). On the other hand, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9–10 (omitting citations). The Eighth Amendment does not prohibit all applications of force that inflict pain against prisoners. United States. v. Gore, 592 F.3d 489, 494 (4th Cir. 2010). Prison administrators are entitled to broad deference in determining what policies and practices are necessary to preserve or restore security and order. Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998).

In short, the "core judicial inquiry [is] . . . the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm." Wilkins, 130 S.Ct. at 1179. The extent of the injury the inmate suffered is relevant to both of these determinations: as a factor in determining "whether use of force could plausibly have been thought necessary in a particular situation" and as "some indication of the amount of force applied." Id. at 1178. If the court cannot find that "the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under this two-part standard," the defendants are entitled to summary judgment on the issue of excessive force. Whitley, 475 U.S. at 322.

## C. Discussion

### 1. No Excessive Force Claim

#### a. Vitatoe and Neece

Blount argues that Vitatoe and Neece, by refusing to tell their supervisor that the handcuff was causing Blount pain, maliciously allowed the continued use of excessive force for five hours.  This argument has no merit.

By Blount's own admission, a piece of equipment, and not a prison official, inflicted the only harmful force of which Blount complained of on May 20, 2011.  Blount does not claim that the ambulatory restraints as the officers initially applied them caused him pain.  The only harmful force that morning occurred when Blount's own movements triggered the handcuff to collapse around his wrist.[4]  The natural operation of the equipment then locked the cuff in that position, and the continued pressure from the hard edge of the handcuff squeezed against Blount's arm, causing the pain he experienced.  Therefore, the evidence does not support a reliable inference that Vitatoe and Neece wantonly applied force to inflict pain.  Whitley, 475 U.S. at 322.  The court grants the motion for summary judgment as to any claim of excessive force by these defendants, and will separately address the claim Blount alleges against them as one of deliberate indifference to a serious risk of harm under Seiter and Estelle.

#### b. Sgt. Lambert

Blount also fails to marshal evidence on which he could persuade a jury that Lambert maliciously applied force for the purpose of inflicting harm.  This court has held that

> [i]n response to an inmate's admittedly disruptive misconduct, a temporary
> limitation of an inmate's access to hygiene products, bedding, eating utensils, and
> freedom of movement, which causes the inmate no physical injury other than

---

[4]   The defendants do not concede that an officer improperly locked the cuff and mention the possibility that Blount himself tampered with the cuff to cause its collapse, which Blount denies.

temporary discomfort and embarrassment, simply cannot qualify as a use of force that is "repugnant to the conscience of mankind."

Holley v. Johnson, Case No. 7:08CV00629, 2010 WL 2640328, *14 (W.D. Va. 2010) (upholding as constitutional maintaining inmate in ambulatory restraints for 48 hours) (citing other cases). Ambulatory restraints, as a control mechanism, properly applied and maintained even for a lengthy period, are "not a use of force that offends contemporary standards of decency so as to satisfy the objective component of an excessive force claim." Id.

It is undisputed that Lt. Fannin ordered application of the ambulatory restraints at around 12:30 a.m. in response to Blount's disruptive behavior—covering his window, refusing orders to uncover it, and then refusing to obey orders to reenter his cell. Once notified of the clamped handcuff, Lambert merely readjusted the ambulatory restraints to their proper application and then maintained them as Fannin had ordered in response to Blount's behavior. Blount's total time in ambulatory restraints on May 20, 2011, was approximately ten and a half hours.

Blount alleges vaguely that the reapplied restraints continued "hurting his wrist" for the additional five hours after Lambert reapplied the restraints (DE 1, p. 2). The court need not credit this conclusory allegation as true, however, because the facts Blount offers do not support a reasonable inference that the hours Blount spent in ambulatory restraints after Lambert fixed the handcuff aggravated the wrist injury.

The video clip shows Lambert, at around 6:30 a.m, carefully readjusting the restraints to be sure they will not cause any further injury to Blount's wrist. (DVD Movie Clip 20110520063217) Blount complains that his wrist and hand are hurting as a result of the clamped cuff, but once Lambert gets the cuff readjusted, Blount makes no complaint that the restraints as applied are causing him pain. Blount complains on camera that the cuffs will rub against his sore wrist, but the video shows the reapplied cuff around the wrist at the heel of the

11

hand, while visible higher up on Blount's wrist toward his forearm is a definitive indention from the earlier cuff malfunction.  Lambert asks the nurse to check both the wrist injury and the clearance between the reapplied cuffs and Blount's wrists, and she and Blount verify on camera that there is sufficient clearance.  Before Lambert leaves, he gives Blount two opportunities to tell him about any other problem with the way the restraints are applied.  Blount complains that he should be released because he has not been disruptive, but Blount does not identify any current problem with the way Lambert has applied the restraints.

In the video footage of Blount's release from ambulatory restraints at 11:00 a.m., he makes no complaint of wrist pain to the officers as they escort him back to his cell and remove the shackles and the black box over the cuffs.  (DVD Movie Clip 20110520105412)   When the same nurse comes to assess Blount, he tells her that his wrist is hurting and his hand is numb. The nurse notes his complaints of pain on camera and states that Blount did have an indention on his wrist earlier from the handcuff collapsing.  The nurse also advises Blount that he will receive Tylenol, that he may use cold compresses on the area, and that if it continues to bother him, he should file a sick call request.  A few moments later, as the video shows Blount extending his hands through the tray slot in the cell door for the officers to remove the handcuffs and then drawing them back inside the cell, there is no such indentation visible on his left wrist.

Because Blount's affidavit statement that the restraints as Lambert applied them hurt his wrist is blatantly contradicted by the record, such that no reasonable jury could believe Blount's version, the court cannot adopt his version for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380.  The court concludes that the evidence does not support a reasonable inference that the force Lambert applied was "'objectively harmful enough' to offend 'contemporary standards of decency'" so as to meet the objective component of Blount's Eighth

12

Amendment claim. Stanley, 134 F.3d at 634.   The court will grant the motion for summary

judgment as to Blount's claim of excessive force as to Lambert and will also address Blount's

claim against Lambert as one of deliberate indifference to a serious risk of harm under Seiter and

Estelle.

## 2. No Deliberate Indifference Claims

Defendants offer evidence that Blount suffered no serious injury as a result of the

handcuff accident on May 20, 2011.  The nurse who examined Blount at the time the cuffs were

readjusted noted in the record that he had a "slight indentation" on his left wrist which was

slightly red and noted no open areas.  When officers released Blount from the ambulatory

restraints four hours later, although he still complained of wrist pain and reported numbness in

his hand, the nurse noted no indentation  on the wrist and noted a full range of motion.  That day,

the nurse provided Tylenol, which had been prescribed for Blount for five days after a previous

ambulatory restraints incident on May 16, 2011.  The medical records do not show that Blount

sought any further medical assessment of the wrist injury by a doctor, that he asked the medical

staff to renew the Tylenol prescription for this injury, or that he sought any other medication or

treatment to alleviate the pain and numbness allegedly caused by the May 20, 2011 incident.

In response to defendants' evidence, Blount offers his affidavit, the video footage, copies

of three articles about nerve compression caused by overly tightened handcuffs, and a document

indicating that the nurse who examined him on May 20, 2011 has been professionally

reprimanded on one occasion for documenting that she performed a physical assessment on an

inmate that she did not perform.  This information is not sufficient to present a genuine issue of

material fact as to the seriousness of Blount's wrist injury.  Blount asserts that the video footage

proves the nurse understated the extent of his injury.  The video footage, however, is not

inconsistent with the nurse's notes.  The indention is visible in the 6:30 a.m. footage and appears

red even against Blount's dark skin, but whether the mark is slight, rather than deep, as Blount

alleges, is a matter of opinion.   (DVD Movie Clip 20110520063217)  In the 11:00 a.m. footage

of Blount's release, no indention is obvious on his left wrist.  (DVD Movie Clip

20110520105412)

      Blount also accuses the nurse of noting that she performed a range of motion examination

that the video footage does not depict.  The court finds no discrepancy here.  The 11:00 a.m.

video shows Blount holding his glasses, using all the fingers of both hands, as the nurse is

speaking to him.  (Id.)  Thus, her note that he displayed full range of motion is not inconsistent

with her observations.  Nor does the court find the evidence of the nurse's prior reprimand to be

supportive of Blount's claim.  In the instant case, the fact of the nurse's assessment of Blount's

condition is documented on the video.

      One of the articles Blount introduces concerns a report of a 27-month study conducted by

medical doctors at Grady Hospital in Atlanta, Georgia, on patients who reported "an abnormal

tingling sensation or numbness in their wrists" after having been handcuffed while in police

custody.  (DE 39-3, p. 4.)  The researchers diagnosed these patients with a "nerve compressive

injury" as a result of handcuffs applied too tightly; the cuffs compressed the "superficial radial

nerve which directs sensations over the web of skin between the thumb and index fingers."  (Id.)

In rare cases, in which the nerve was killed, "the injury was severe and permanent," but in "most

cases, the nerve was not dead, but severely damaged [causing it] to transmit the wrong

sensations," such that a "light touch . . . might feel like burning."  (Id.)  The sensations Blount

describes suffering ("numbness and sharp[ ] pains in [his] wrist, thumb and pinkie" (DE 39-1,

¶11) are not consistent with the symptoms the researchers associated with permanent nerve

compression injuries.  Moreover, by Blount's own admission, his symptoms completely resolved in six weeks and did not generate pain severe enough to motivate Blount to seek a doctor's diagnosis or pain control medication.

For the stated reasons, the court cannot find that Blount has presented sufficient evidence on which reasonable jurors could find by a preponderance of the evidence that he suffered a serious injury on May 20, 2010 from defendants' actions or that the injury he incurred constituted a serious medical need.  Because Blount thus fails to establish the objective element of his deliberate indifference claims, under Seiter and Estelle, supra, defendants are entitled to summary judgment as a matter of law.  The court grants defendants' motion for summary judgment.

### III

In conclusion, the court finds that Blount fails to present any genuine issue of material fact in dispute on which he could persuade reasonable jurors to return a verdict in his favor as to his claims against Defendants Vitatoe, Neece, and Lambert.  Therefore, these defendants are entitled to summary judgment as a matter of law, and the court grants their motion.  An appropriate order will issue this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff.

ENTER:  This _____ day of August, 2012.

_____
Chief United States District Judge

15